UNTIED STATES DISTRICT JUDGE BENJAMIN H. SETTLE
MAGISTRATE JUDGE J. RICHARD CREATURA

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NATHAN ROBERT GONINAN aka NONNIE
LOTUSFLOWER,

               Plaintiff,

     v.

STEPHEN SINCLAIR, in his official capacity,
SARA SMITH KARIKO, M.D., in her official
capacity, BRUCE GAGE, M.D., in his official
capacity, and KARIE RAINER, in her official
capacity,

               Defendant.

No. 3:17-cv-05714-BHS-JRC

AMENDED COMPLAINT

## INTRODUCTION

1.1.    Plaintiff Nathan Robert Goninan aka Nonnie Lotusflower ("Plaintiff" and/or

"Lotusflower") is currently incarcerated by the Washington Department of Corrections ("DOC")

in Monroe Correctional Complex ("MCC") in Monroe, WA after a recent move from

Washington State Penitentiary ("WSP") in Walla Walla, WA.

AMENDED COMPLAINT - 1
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1.2.     Ms. Lotusflower has been in DOC custody since August 2017.

1.3.     Ms. Lotusflower is a transgender woman—an individual whose gender identity (female) is different from the male gender assigned to her at birth ("assigned gender").[1]

1.4.     Ms. Lotusflower is Native American and recognizes that some individuals are Two-Spirit, a Native American concept encompassing cross-gender identifying and gender nonconforming individuals.

1.5.     Ms. Lotusflower is diagnosed by DOC as suffering from gender dysphoria (previously known as Gender Identity Disorder), a serious medical condition characterized by strong cross-gender identification, and clinically significant distress stemming from the disconnect between one's assigned gender and one's gender identity.

1.6.     As a result of gender dysphoria, Ms. Lotusflower experiences severe distress resulting from the incongruence between her typically-male physical features and her female gender identity. She requires medically necessary care to treat gender dysphoria.

1.7.     The most common forms of treatment for gender dysphoria are counseling, social transition that includes living fully consistent with one's gender in all aspects of life, hormone therapy, and gender affirming surgeries that conform primary or secondary sex characteristics with gender identity.

1.8.     Counseling for individuals with gender dysphoria is aimed at supporting patients in managing the distress flowing from discrimination and bias that transgender people typically experience from other people or institutions.

---

[1] At birth, infants are classified as male or female based on a visual observation of their external genitalia. This classification becomes the person's "sex assigned at birth," but may not be the same as the person's sex/gender identity.

AMENDED COMPLAINT - 2
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

1.9.    Counseling for individuals with gender dysphoria is not a substitute for other interventions.

1.10.    Prior to her incarceration at DOC, Ms. Lotusflower was diagnosed with gender dysphoria and lived consistently with her identity as a woman while incarcerated at and in the custody of Oregon Department of Corrections ("ODOC") until August 2017.

1.11.    After her transfer from ODOC to DOC, Ms. Lotusflower's gender dysphoria diagnosis was confirmed by DOC.

1.12.    Once in the custody of DOC, Ms. Lotusflower sought appropriate medical treatment, including access to feminizing hormones, evaluation for gender affirming surgery,[2] and the ability to live as a woman while incarcerated. However, Defendants deprived her of medically necessary treatment, and instead have repeatedly punished her for expressing her gender identity, including but not limited to denying her access to programming and subjecting her to extensive periods in solitary confinement.

1.13.    Defendants' denial of necessary medical treatment, as well as discipline and punishment of Ms. Lotusflower for expressing her female gender, have caused grave and unnecessary suffering and harm to Ms. Lotusflower, including attempted self-castrations and suicide attempts.

1.14.    Defendants' actions violate the Eighth Amendment to the U.S. Constitution's prohibition on cruel and unusual punishment by denying Ms. Lotusflower's necessary medical treatment and failing to protect her from harm.

---

[2] Gender affirming surgery is also sometimes referred to as "sex reassignment surgery" or "gender confirming surgery."

AMENDED COMPLAINT - 3
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1.15.    Ms. Lotusflower seeks injunctive and declaratory relief to remediate Defendants' violations of her rights.

JURISDICTION AND VENUE

2.1.    Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution.

2.2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

2.3.    Plaintiff seeks declaratory and injunctive relief for Defendants' violation of Plaintiff's civil rights under 28 U.S.C. §§ 1343 and 42 U.S.C. §§ 1983.

2.4.    Venue is properly in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claim occurred in this District.

2.5.    Defendants waived any requirement that Plaintiff exhaust administrative remedies. *See* Docket #34.

PARTIES

3.1.    Plaintiff Nonnie Lotusflower is Native American. She is currently housed at MCC and has been in the custody and control of DOC since August 2017.

3.2.    Defendant Stephen Sinclair is Secretary of DOC, a State agency responsible for incarceration of adult inmates sentenced by the courts. Mr. Sinclair is responsible for operation of DOC adult correctional facilities in Washington, including MCC where Plaintiff Lotusflower is housed. In his role as Secretary of DOC, Mr. Sinclair has a duty to ensure DOC provides constitutionally adequate medical care to prisoners in its custody. He has authority to direct the activities of subordinate officers and other DOC employees, and is expressly empowered by the Washington State Legislature to "make rules necessary to carry out the intent of [health care

AMENDED COMPLAINT - 4
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

services]" in DOC. RCW 72.10.040. At all times relevant to this action, Mr. Sinclair was acting under color of state law. Mr. Sinclair is sued in his official capacity.

3.3. Defendant Sara Smith Kariko, M.D. is Chief Medical Officer ("CMO") for DOC.[3] The DOC CMO is "a licensed doctor of medicine who acts as the statewide clinical health services authority." Offender Health Plan at p 5. In that role, Dr. Kariko has a duty to ensure DOC provides constitutionally adequate medical care to prisoners in its custody. She has authority to approve or deny medical treatment for DOC prisoners. At all times relevant to this action, Dr. Kariko was acting under color of state law. Dr. Kariko is sued in her official capacity.

3.4. Defendant Bruce Gage, M.D. is Chief of Psychiatry for DOC. In that role, he has a duty to ensure DOC provides constitutionally adequate medical care to prisoners in its custody. He has authority to approve or deny medical treatment for DOC prisoners. At all times relevant to this action, Dr. Gage was acting under color of state law. Dr. Gage is sued in his official capacity.

3.5. Defendant Karie Rainer is Director of Mental Health for DOC. In that role, she has a duty to ensure DOC provides constitutionally adequate medical care to prisoners in its custody. She has authority to approve or deny medical treatment for DOC prisoners. At all times relevant to this action, Dr. Rainer was acting under color of state law. Dr. Rainer is sued in her official capacity.

3.6. At all times relevant herein, each Defendant was acting in the course and scope of his or her employment and under color of state law.

---

[3] Plaintiff originally named as a Defendant G. Hammond, who was the then Chief Medical Officer, but has since been replaced by Dr. Kariko.

AMENDED COMPLAINT - 5
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

## FACTUAL ALLEGATIONS

## GENDER DYSPHORIA IS A RECOGNIZED SERIOUS MEDICAL CONDITION

4.1.     Gender Dysphoria is a diagnosable and treatable condition included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), as well as the International Classification of Diseases-10 ("IDC-10").[4]

4.2.     "Gender dysphoria" is a diagnostic term that refers to clinically significant distress associated with an incongruence or mismatch between a person's gender identity and assigned sex.

4.3.     When gender dysphoria is severe and untreated, it can result in a person's inability to function in everyday life. Gender dysphoria is highly treatable. Indeed, with appropriate treatment, individuals with gender dysphoria experience significant relief from

---

[4] The DSM-5 describes the criteria as follows: Gender Dysphoria in Adolescents and Adults 302.85 (F64.1)

   A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

      1.    A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

      2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

      3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.

      4.    A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

      5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

      6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

   B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

DSM-5 at 452-53.

AMENDED COMPLAINT - 6
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1   distress.

2      4.4.    When not properly treated, however, gender dysphoria is often associated with

3   dangerous related conditions such as clinically significant psychological distress, dysfunction,

4   depression, substance use, self-harm, including attempts to perform auto-castration or auto-

5   penectomy that can lead to serious and life-threatening injuries, suicidality, and death.

6      4.5.    Without treatment, the path for those suffering from gender dysphoria can be

7   torturous, as evidenced by alarmingly high suicide attempt rates: 40 percent of persons

8   identifying as transgender attempt suicide, nearly 9 times the national average of 4.6 percent,

9   according to the 2015 National Transgender Discrimination Survey.[5]

10     4.6.    The data for suicide attempts by incarcerated transgender people increases when

11  they are harassed and mistreated. Citing to the Journal of Correctional Health Care, JCHC Vol.

12  24, Issue 2: April 2018, The National Commission on Correctional Healthcare ("NCCHC")  also

13  cautions there is a "42% increase in the odds of reporting attempted suicide when [prisoners with

14  gender dysphoria are] victimized by an inmate and a 48% increase when [ . . . ] victimized by

15  correctional staff."[6]

16     4.7.    Plaintiff's history reflects such effects resulting from inadequate treatment: she

17  has repeatedly experienced suicidal ideation and has engaged in dangerous attempts to self-harm

18  and self-castrate as a response to her despair over Defendants' denial of necessary treatment for

19  her gender dysphoria.

20          STANDARDS OF CARE FOR INCARCERATED PEOPLE WITH GENDER
            DYSPHORIA

21

22  _____

[5] Available at  https://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF
23  [6] NCCHC Vol 32, Issue 32: Spring 2018 at p. 23.

AMENDED COMPLAINT - 7                    **AMERICAN CIVIL LIBERTIES UNION OF**
3:17-cv-05714-BHS-JRC                         **WASHINGTON FOUNDATION**
                                               901 FIFTH AVENUE #630
                                               SEATTLE, WA 98164
                                               (206) 624-2184

4835-4807-2852v.1 0200495-000017

4.8.     The World Professional Association for Transgender Health ("WPATH") is the leading international organization focused on transgender health care.

4.9.     WPATH has more than 1,000 members throughout the world consisting of physicians, psychiatrists, psychologists, social workers, surgeons, and other health professionals who specialize in the diagnosis and treatment of gender dysphoria.

4.10.    WPATH publishes the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care").

4.11.    The WPATH Standards of Care were first developed in 1979.

4.12.    The current version of the Standards of Care, Version 7[7] was published in September 2011 following a five-year process in which eighteen gender dysphoria specialists submitted peer-reviewed papers to help identify the most effective treatments for gender dysphoria.

4.13.    WPATH's Standards of Care are recognized by the leading medical and mental-health professional groups as the authoritative and the prevailing standards of care for treating gender dysphoria.

4.14.    The Standards of Care apply equally to prisoners, and expressly state:

> Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community. . . . All elements of assessment and treatment as described in the SOC can be provided to people living in institutions. Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health

[7] Eli Coleman et al., Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, Version 7, 13 Int'l J. of Transgenderism 165 (2011),

AMENDED COMPLAINT - 8
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.[8]

4.15.   NCCHC recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.[9]

4.16.   Under WPATH Standards of Care, treatment for gender dysphoria is designed to help individuals live congruently with their gender identity and thus alleviate the clinically significant distress.

4.17.   Treatment protocols include socially transitioning (dressing, grooming, and presenting oneself to others in accordance with one's gender identity), hormone therapy, and surgeries.

4.18.   The particular course of medical treatment varies based on the individualized needs of the person.

PEOPLE WITH GENDER DYSPHORIA MUST BE ABLE TO ACCESS TREATMENT DETERMINED TO BE MEDICALLY NECESSARY, INCLUDING GENDER AFFIRMING SURGERY

4.19.   The goals of medical treatments for gender dysphoria, as stated in the Standards of Care, are (1) to alleviate clinically significant distress and impairment of functioning associated with gender dysphoria, and (2) to maximize overall psychological well-being.

---

[8] *Id.* at 67.

[9] NCCHC Policy Statement, Transgender Health Care in Correctional Settings (October 18, 2009; reaffirmed with revision April 2015), http://www.ncchc.org/transgender-health-care-in-correctional-settings (last visited March 22, 2019) (footnote omitted).

AMENDED COMPLAINT - 9
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4.20.    As recognized by both the DSM-V and the Standards of Care, people with gender dysphoria who do not receive appropriate medical treatment are at risk of depression, anxiety, suicide, and genital self-harm, including attempts to perform auto-castration or auto-penectomy that can lead to serious and life-threatening injuries.

4.21.    The Standards of Care set forth treatment options for gender dysphoria including: changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity); hormone therapy to feminize or masculinize the body; surgery to change primary and/or secondary sex characteristics (e.g. breasts/chest, external and/or internal genitalia, facial features, body contouring); and psychotherapy addressing the negative impact of gender dysphoria and stigma on mental health, alleviating internalized transphobia, enhancing social and peer support, improving body image, or promoting resilience.

4.22.    After a diagnosis of gender dysphoria is made, the Standards of Care require that a competent medical professional with knowledge and expertise in gender dysphoria evaluate a patient for appropriate and necessary treatment options. This medical treatment not only improves a patient's quality of life, but also limits the development of mental health issues, which often accompany lack of treatment.

4.23.    The Standards of Care also make clear that surgical care to treat gender dysphoria is not "elective." WPATH Standards of Care at p. 55.

4.24.    For many people, gender affirming surgery is an "essential and medically necessary" treatment to alleviate gender dysphoria. WPATH Standards of Care at p. 54. Hormone therapy alone is not sufficient for such individuals.

4.25.    All of the WPATH Standards of Care apply to individuals in institutional

AMENDED COMPLAINT - 10
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

environments such as prisons.

4.26.   The Standards of Care state that "[a]ll elements of assessment and treatment as described in the SOC can be provided to people living in institutions…If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care."  WPATH Standards of Care at p. 67.

4.27.   Leading medical and mental-health professional groups—including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Congress of Obstetricians and Gynecologists, the Endocrine Society, the National Association of Social Workers, and WPATH—all agree that gender dysphoria is a serious medical condition, and that treatment for gender dysphoria is medically necessary for many transgender people.

DOC'S GENDER DYSPHORIA POLICY

4.28.   The DOC provides health services to prisoners according to the Offender Health Plan ("OHP"), which defines the services the Department considers "medically necessary."

4.29.   The OHP recognizes gender dysphoria as a diagnosis qualifying a prisoner for treatment and then incorporates by reference the DOC's Gender Dysphoria Protocol for the purposes of that treatment.

4.30.   The Gender Dysphoria Protocol (the "Policy") provides that "the correctional environment is a relative contraindication to the indication of sexual reassignment treatment, as are self-inflicted genital or other forms of self-mutilation," but certain limited treatments may be available under certain circumstances.

AMENDED COMPLAINT - 11
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4.31.    Authorization of medically necessary treatment for gender dysphoria is typically determined on a case-by-case basis by the Gender Dysphoria Care Review Committee[10] ("GD CRC"), which reviews case summaries and votes on whether or not to authorize proposed care.

4.32.    The GD CRC case must be presented by, at a minimum, the treating psychiatrist, primary therapist,[11] and medical provider.

4.33.    Those charged with treatment—specifically, the "treating correctional provider and/or clinical consultants," and "consulting community endocrinologist, psychiatrist or other specialist (as necessary)" as it relates to the gender dysphoria specific-care of their patient—have no vote in this decision-making process.

4.34.    Only the Defendants DOC Chief Medical Officer, Chief of Psychiatry and Mental Health Director are voting members of the GD CRC. "Decisions of the GD CRC are made by majority vote" of these three (3) functions.

4.35.    However, the GD CRC was barred from authorizing gender affirming surgery under any circumstances until June 19, 2018—287 days after this matter was filed with the Court, and as a result, the GD CRC denied Ms. Lotusflower's request for medically necessary gender affirming surgery.

## PRE-LAWSUIT BLANKET BAN OF MEDICALLY NECESSARY GENDER AFFIRMING TREATMENT

4.36.    The OHP includes a Level III classification for medical treatment that it deems

---

[10] DOC's defines the CRC as a "[g]roup of DOC primary care physicians, dentists, Pas, and ARNPs, organized in discipline- or condition-specific committees, appointed by the Chief Medical Officer (CMO) to review the medical necessity of proposed health care." OHP, effective March 18, 2018 at p. 5.

[11] "Mental health staff provider responsible for coordinating an offender's mental health care." OHP, effective March 18, 2018 at p. 5.

AMENDED COMPLAINT - 12
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

"not medically necessary."

4.37. Those services categorized as Level III "cannot be authorized by an individual provider or CRC" "even if medically appropriate."

4.38. Regarding gender dysphoria, the Policy states:

**Offenders with [gender dysphoria] and [transgender] identification are NOT eligible for:**

Cosmetic or elective surgical procedures for the purpose of reassignment. Such interventions are considered Level III by the Offender Health Plan (OHP)

4.39. Even though surgical treatment for gender dysphoria is neither cosmetic nor elective, the DOC applied this ban to all surgical treatment regardless of medical need.

4.40. DOC Chief of Psychiatry Dr. Gage admitted in September 2017 that since 2009 "sex reassignment surgery" has been a Level III service that "is not provided under the OHP."

4.41. In a September 2017 email, Dr. Gage explained the history of DOC's blanket ban:

In 2009, there was no separate mental health section in the OHP. At that time, 'gender modification' was listed as a level I service for continuation of hormone therapy but with some conditions. It was listed as a level II service when the person was not receiving hormone therapy at the time of admission to DOC. It was also listed as a level 3 service with regard to surgery or other treatments not specified in the level I and II sections.

GID/GD has been in the mental health section of the Offender Health Plan since its inception in 2011. Initially, it was broken into level I for continuation of community treatment but subject to the GID CRC/guideline and as level II for 'gender modification' subject to the GID guideline. The language of the preceding paragraph was retained in the medical section of the OHP until 2012 when we made GID treatment generally a level II condition subject to the GID protocol (where the GID-CRC and criteria were specified). The reason we made it level II was that treatment of GID (now GD) was always subject to the GID guideline/CRC and was thus more properly considered level II – treatment that would not always be provided. 'Gender modification' was retained in the medical section

AMENDED COMPLAINT - 13
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

under level III for surgical treatment and other treatment not covered by the GID guideline/CRC.

In July 2017, the Gender Dysphoria protocol was modified to include transgendered persons and to remove language regarding medical necessity in favor of continuation of a sexual reassignment regimen or treatment being 'clinically indicated,' and also subject to the person's willingness to disclose healthcare information and the absence of contraindications to treatment.

With regard to surgery, the current language in the Gender Dysphoria protocol is clear:

"Offenders with GD and TG identification are NOT eligible for:

• Cosmetic or elective surgical procedures for the purpose of reassignment. Such interventions are considered Level III by the Offender Health Plan (OHP)"

As you probably know, level III means the service is not provided under the OHP. In short, surgery for gender reassignment is level III. This has been the meaning of the language you asked about since 2009.

4.42.   DOC's blanket ban deeming gender affirmation surgery as "not medically necessary" under any circumstances was directly at odds with well-established medical principles and the individualized evaluations provided by DOC staff which have repeatedly found gender affirming surgery medically necessary for Plaintiff Lotusflower[12].

DEFENDANTS DELIBERATELY WITHHELD FROM PLAINTIFF MEDICALLY NECESSARY TREATMENT

4.43.   Plaintiff Lotusflower is currently incarcerated by DOC in MCC in Monroe, WA, following a transfer from WSP in Walla Walla, WA.

4.44.   Ms. Lotusflower has been incarcerated and in DOC custody since August 2017.

---

[12] In July 2018, in response to Plaintiff's Motion for Partial Summary Judgment, which challenged DOC's "blanket ban" as a violation of the Eighth Amendment, DOC modified the OHP to categorize treatment for Gender Dysphoria under "Level II" services.

AMENDED COMPLAINT - 14
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

4.45.   Ms. Lotusflower is a transgender woman—an individual whose gender identity (female) is different from the male gender assigned to her at birth. She identified as female very young in her life.

4.46.   Ms. Lotusflower is Native American and her Tribe recognizes that some individuals are Two-Spirit, a Native American concept encompassing cross-gender identifying and gender nonconforming individuals.

4.47.   Immediately prior to incarceration at DOC, Ms. Lotusflower was in the custody of ODOC.

4.48.   On or about October 31, 2016, ODOC Dr. Mary McCarthy, M.D. diagnosed Ms. Lotusflower with gender dysphoria.

4.49.   Ms. Lotusflower's gender dysphoria causes her to experience severe distress resulting from the incongruence between her typically-male physical features and her female gender identity, and requires medically necessary care and treatment.

4.50.   The most common forms of treatment for gender dysphoria are counseling, social transition that includes living fully consistent with one's gender in all aspects of life, hormone therapy, and gender affirming surgeries that conform primary or secondary sex characteristics with gender identity.

4.51.   Counseling for individuals with gender dysphoria is aimed at supporting patients in managing the distress flowing from discrimination and bias that transgender people typically experience from other people or institutions

4.52.   While still in ODOC custody and less than two (2) months from her initial gender dysphoria diagnosis, on or about December 8, 2016, it was deemed medically necessary to

AMENDED COMPLAINT - 15
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

provide Ms. Lotusflower with gender affirming medical care and treatment to address her gender dysphoria.

4.53.   On February 14, 2017, ODOC deemed it medically necessary for Ms. Lotusflower to be placed on Hormone Replacement Therapy ("HRT") to manage her symptoms of gender dysphoria and she lived full-time as a woman while incarcerated until August 2017, when she was transferred to DOC.

4.54.   After her transfer from ODOC to DOC, Ms. Lotusflower's gender dysphoria diagnosis was confirmed by DOC.

4.55.   Ms. Lotusflower sought appropriate medical treatment from DOC, including continued access to hormone therapy, evaluation for gender affirming surgery, and the ability to live as a woman while incarcerated.

4.56.   Defendants have refused to allow Plaintiff to access such medically necessary treatment, and instead have repeatedly punished, taunted and harassed Plaintiff for expressing her female gender, including but not limited to Ms. Lotusflower repeatedly being called names like "tranny" by DOC staff, and being placed in solitary confinement for excessive and inhumane periods, often causing significant deterioration of her mental health.

4.57.   Defendants and DOC have a blanket policy banning the use of makeup, which is medically necessary for gender nonconforming prisoners in male prisons, and have otherwise denied medically necessary treatments including allowing women's undergarments and clothing and other feminizing methods.

4.58.   Defendants have further denied Plaintiff the benefits of public services, programs and activities as a result of her gender dysphoria, failed to provide proper and reasonable training to custody and health staff in responding to persons with gender dysphoria; and disciplined

AMENDED COMPLAINT - 16
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

Plaintiff for actions or behavior related to gender dysphoria and imposing punishments depriving Plaintiff of programs and activities because of such actions or behavior in a manner detrimental to her health.

DEFENDANTS' FAILURE TO PROVIDE MEDICALLY NECESSARY TREATMENT

4.59.    Even DOC's own medical professional Dr. Patricia Zeisler found that "[a]t this time corrective surgery is medically necessary in order to completely eradicate the gender dysphoria."

4.60.    Similarly, a primary encounter report signed by DOC Dr. Wendi Wachsmuth found that Lotusflower "needs gender confirming surgery to relieve her gender dysphoria".

4.61.    To date, Plaintiff Lotusflower's requests for gender affirming surgery have been denied by DOC--first as Level III services according to the blanket ban Policy and then at urging of a paid gender dysphoria consultant, Stephen Levine, PhD, whose opinions have been rejected by several courts across the country.

4.62.    Two courts in the Ninth Circuit have noted the lengths to which Dr. Levine will go to determine incarcerated people with gender dysphoria are not entitled to gender affirming surgery. The Northern District of California gave "very little weight to the opinions of Levine, whose report misrepresents the Standards of Care; overwhelmingly relies on generalizations about gender dysphoric prisoners, rather than an individualized assessment of [the complainant]; contains illogical inferences; and admittedly includes references to a fabricated anecdote." *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015), appeal dismissed and remanded, 802 F.3d 1090 (9th Cir. 2015).

4.63.    Just last year, a district court in neighboring Idaho wrote: "Dr. Levine is

AMENDED COMPLAINT - 17
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

considered an outlier in the field of gender dysphoria and does not ascribe to the WPATH

Standards of Care. His training materials do not reflect opinions that are generally accepted in

the field of gender dysphoria." *Edmo v. Idaho Dep't of Correction*, 358 F. Supp. 3d 1103 (D.

Idaho 2018)).

4.64.   Defendants were aware of the *Norsworthy* opinion and the above concerns raised

by that court before entering into the gender dysphoria consultant contract with Dr. Levine.

4.65.   The mere use of Dr. Levine as a paid DOC gender dysphoria consultant evidences

Defendants' lack of intention to provide medically necessary treatment to those with gender

gysphoria, including Plaintiff.

PLAINTIFF'S CLAIMS FOR RELIEF

CLAIM FOR RELIEF<br>
Failure to Provide Necessary Medical Treatment<br>
(Eighth Amendment; 42 U.S.C. § 1983)<br>
<em>Against ALL Defendants</em>

5.1   Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as if

fully set forth herein.

5.2   Plaintiff has been diagnosed with the serious medical condition of gender

dysphoria, which continues to cause Plaintiff serious mental distress and, without necessary

treatment, has resulted in serious physical harm to Plaintiff.

5.3   Defendants are responsible for providing adequate and necessary medical

treatment to Plaintiff, including treatment for persons diagnosed with gender dysphoria.

5.4   Defendants have failed to follow even DOC's own policies relating to Plaintiff's

treatment. For example, Defendants failed to convene and/or conduct the necessary DOC CRC

meetings to meaningfully evaluate Plaintiff's treatment for gender dysphoria.

AMENDED COMPLAINT - 18
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

5.5     Defendants have failed to provide adequate and necessary treatment to Plaintiff that is consistent with prevailing medical standards of care for gender dysphoria, as evidenced, in relevant part, by Defendants and DOC's blanket policy banning the use of makeup, women's clothing and other feminizing methods, which are medically necessary for gender nonconforming prisoners in male prisons.

5.6     Defendants' acts and/or omissions with respect to Plaintiff's treatment reflect Defendants' policy, custom, practice and/or procedure of failing to provide adequate and necessary medical treatment to inmates with gender dysphoria.

5.7     Each Defendant has been and remains deliberately indifferent to Plaintiff's medical need to be adequately treated for gender dysphoria, including but not limited to evaluation for gender affirming surgery by an unbiased qualified medical personnel with expertise in the diagnosis and treatment of gender dysphoria and provision of such surgery, if determined appropriate, as well as other medical treatments and accommodations that would alleviate Plaintiff's serious medical symptoms.

5.8     Each Defendant has known of Plaintiff's serious medical need for treatment for gender dysphoria and failed to take reasonable measures to address Plaintiff's continued pain and suffering resulting from her inadequately treated gender dysphoria.

5.9     Defendants' continued denial of necessary medical treatment for gender dysphoria is causing irreparable harm and unnecessary suffering to Plaintiff, including severe anxiety and distress resulting in emotional, psychological, and physical harm.

5.10     Defendants' failure to provide necessary medical treatment to Plaintiff violates the Eighth Amendment to the U.S. Constitution.

5.11     As a direct and legal result of Defendants' actions and omissions, Plaintiff has

AMENDED COMPLAINT - 19
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

suffered and continues to suffer damages including, without limitation, pain and suffering; emotional, psychological and physical distress; and violation of dignity.

5.12    Defendants by engaging in the aforementioned acts or omissions and/or in ratifying such acts or omissions, engaged in willful, malicious, intentional, and/or oppressive conduct, and/or acted with willful and conscious disregard of the rights, welfare, and safety of Plaintiff, thereby justifying injunctive and declaratory relief.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests entry of judgment in her favor and against Defendants as follows:

1.    For injunctive and declaratory relief, including but not limited to enjoining Defendants to provide Plaintiff with adequate and necessary medical care;

2.    For injunctive and declaratory relief, including but not limited to enjoining Defendants to provide Plaintiff equal access to clothing, cosmetic, and hygiene items available to inmates housed in female institutions;

3.    For injunctive and declaratory relief, including but not limited to enjoining Defendants to house Plaintiff at an institution consistent with her gender identity;

4.    For injunctive and declaratory relief, including but not limited to declaring unconstitutional and violative of federal law Defendants' practices in denying Plaintiff and other similarly situated inmates with adequate and necessary medical treatment.

5.    For an award of Plaintiff's costs and attorneys' fees:

6.    For leave to amend these pleadings to conform to the evidence as presented at trial; and

7.    For such other and further relief as the Court may deem just and proper.

AMENDED COMPLAINT - 20
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

4835-4807-2852v.1 0200495-000017

DATED this ___th day of April, 2019.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION


By: */s/Antoinette M. Davis*
Antoinette M. Davis, WSBA No. 29821
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
Telephone: (206) 624-2184
tdavis@aclu-wa.org
*Attorneys for Plaintiff*

DAVIS WRIGHT TREMAINE LLP


By: */s/ Kristina Markosova*
Kristina Markosova, WSBA No. 47924
920 Fifth Avenue, Suite 3300
Seattle, Washington 98164
Telephone: (206) 757-8026
kristinamarkosova@dwt.com
*Cooperating Attorneys to the ACLU-WA
Foundation*


CORR CRONIN MICHELSON
BAUMGARDNER FOGG & MOORE LLP


By: */s/ Ben C. Byers*
Benjamin C. Byers, WSBA No. 52299
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Telephone: (206) 625-8600
bbyers@corrcronin.com
*Cooperating Attorney to the ACLU-WA
Foundation*

AMENDED COMPLAINT - 21
3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184

1

## VERIFICATION

Nathan Goninan aka Nonnie Lotusflower, on oath, says:

I am the above named Plaintiff in the above-entitled action; I have read the foregoing AMENDED COMPLAINT and know the contents to be true.

_____          4/11/19_____
NONNIE LOTUSFLOWER, PLAINTIFF            DATE

CERTIFICATE OF SERVICE
No. 3:17-cv-05714-BHS-JRC

AMERICAN CIVIL LIBERTIES UNION OF
WASHINGTON FOUNDATION
901 FIFTH AVENUE #630
SEATTLE, WA 98164
(206) 624-2184